Stephen L. Morrow and Doris M. Morrow, et al. [1] v. Commissioner. Morrow v. Commissioner
Docket Nos. 4588-64 - 4590-64, 4600-64.
United States Tax Court
T.C. Memo 1967-242; 1967 Tax Ct. Memo LEXIS 19; 26 T.C.M. (CCH) 1222; T.C.M. (RIA) 67242; December 6, 1967
Curtis J. Timm, 2041 Main St., Sarasota, Fla., for the petitioners in docket Nos. 4588-64 - 4590-64. David M. Levy and Paul F. *22 Mickey, for the petitioner in docket No. 4600-64. Stephen M. Miller, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in income tax and additions to tax for the taxable years or periods indicated as follows: I.R.C. 1939
Docket No.
Sec. 294
I.R.C. 1954
Petitioner
Year
Deficiency
Sec.
(d)(1)(A)
Sec. 6653(b)
293(b)
4590-64 - Stephen
1950
$ 3,266.05
$ 1,633.03
$ 294.41
L. Morrow [2]
1951
3,622.53
1,811.27
325.26
4589-64 - Doris M.
1950
3,248.93
1,624.47
309.75
Morrow [2]
1951
3,645.93
1,822.97
326.92
4588-64 - Stephen
L. and Doris M.
Morrow
1952
10,150.82
5,075.41
922.03
1953
11,210.44
5,605.22
1,025.86
1954 2a
15,869.12
1,467.90
$ 7,939.69
1955
2,793.97
1,396.99
1956
13,539.31
6,769.66
1957
6,934.06
3,467.03
1958
12,844.49
6,422.25
1959
22,637.98
11,318.99
4600-64 - Stevens
9/30/49
11,366.48
419.20
Truck Lines, Inc.
[3]
10/1-12/31/49
1,684.39
842.20
1950
14,340.01
7,599.74
1951
19,957.60
9,978.80
1952
33,278.21
16,639.11
1953
28,883.66
14,441.83
1954
11,882.39
6,115.31
1955
5,127.00
2,563.50
1956
4,640.37
2,320.19
1957
8,873.92
4,436.96
1958
1,774.30
887.15
1959
2,616.53
1,308.27
*23 Respondent determined the deficiencies asserted with respect to the individual petitioners, Stephen L. and Doris M. Morrow (hereinafter variously referred to as the *24 individuals, the Morrows, or Stephen and Doris), by use of the net worth and expenditures method. The deficiencies determined with respect to the corporate petitioner, Stevens Truck Lines, Inc. (hereinafter referred to as Stevens, or the corporation), reflect respondent's determination that the corporation had unreported income during each taxable period or year in question through the year 1956 and that the corporation improperly claimed various deductions for each taxable period or year in question. Because of respondent's concessions on various matters affecting the liability of both the individual and corporate petitioners and our findings herein, recomputations of the deficiencies and additions to tax under Rule 50 will be required. The following issues require decision. The Individual Petitioners - Stephen L. and Doris M. Morrow (1) Whether the individuals had additional net or taxable income for their taxable years 1950 through 1959 which they failed to report on their respective returns. (2) Whether the increase in net worth plus nondeductible personal expenditures method is an appropriate method for determining the taxable income of the individual petitioners for *25 the years 1950 through 1959. (3) Whether disbursements of the funds of the corporation for personal assets and expenses of the individuals were distributions taxable to the Morrows. (4) Whether the individuals are liable for additions to the tax under section 294(d)(1)(A), I.R.C. 1939, for each of the years 1950 through 1954. (5) Whether all or part of any amounts determined to be underpayments or deficiencies in tax are due to fraud, so the individuals would be liable for additions to tax under section 293(b) of the 1939 Code or section 6653(b) of the 1954 Code. (6) Whether the individuals are collaterally stopped to deny their liability for the addition to tax under section 6653(b), I.R.C. 1954, for the year 1959. (7) Whether the statute of limitations bars assessment with respect to any of the years in question. The Corporate Petitioner - Stevens Truck Lines, Inc. (1) Whether the corporate petitioner had additional net or taxable income for its taxable year ended September 30, 1949, its taxable period October 1 to December 31, 1949, and its taxable years 1950 through 1959, which it failed to report on its respective returns. (2) Whether *26 all or any part of the amounts determined to be underpayments or deficiencies in tax are due to fraud. (3) Whether the statute of limitations bars assessment with respect to any of the years in question. These cases were consolidated for trial and opinion because the corporation was wholly owned and controlled by the Morrows throughout the years here involved and many of the adjustments made by respondent in the income of the corporation were directly related to adjustments made by respondent in the income of the Morrows. However, because Stephen Morrow sold all the stock of the corporation on September 1, 1959, to Anthony J. Pitts, who theretofore had no connection with the corporation and knew nothing about the transactions involved, the Morrows and the corporation were represented at the trial by different counsel, and separate stipulations of fact were entered into between respondent and the two different parties. The stipulation entered into by the corporation was understandably very meager, and it claims not to be bound by the stipulations of the Morrows, which we recognize. However, counsel for the corporation was present throughout the course of the trial and had the opportunity *27 to present evidence in behalf of the corporation and cross-examine all witnesses offered by both of the other parties not only with respect to their direct testimony but also with respect to any stipulated exhibits referred to in their testimony, and all such testimony must be considered in connection with the corporate case as well as the Morrows' case. We have attempted to keep this in mind in making our findings of fact and in reaching the conclusions we do in the two cases, but to hew to the line exactly would be impractical and, for reasons which we think will become apparent, would not do justice to all the parties. General Findings of Fact The facts stipulated by the respective petitioners with respondent are incorporated herein by this reference for purposes of deciding the issues raised by the respective petitions. Petitioners Stephen L. Morrow and Doris M. Morrow are husband and wife and presently reside in Venice, Fla. During the taxable years in question the Morrows resided at 182 North Avenue, Webster, N. Y. For the calendar years 1950 and 1951 Stephen filed individual income tax returns on which he reported net income of $2,070 and $2,295, respectively, with the *28 district director of internal revenue, Buffalo, N. Y. For the years 1950 and 1951 Doris filed individual income tax returns on which she reported net income of $2,205 and $2,115, respectively, with the district director of internal revenue, Buffalo, N. Y. For the years 1952 through 1959 the Morrows filed joint income tax returns with the district director of internal revenue, Buffalo, N. Y., on which they reported net or taxable income as follows: Year
Net Income
Taxable Income
1952
$5,337.84
1953
7,132.10
1954
$10,928.59
1955
15,731.84
1956
13,705.44
1957
8,366.49
1958
39,279.67
1959
33,168.41
The Morrows reported gross income on their joint income tax returns for the years 1956 through 1958 as follows: Year
Gross Income
1956
$16,446.05
1957
11,133.76
1958
44,382.49
On their joint return for 1959, the Morrows initially reported gross income of $40,352.53. Notations on the copy of that return which is in evidence indicate that respondent adjusted the reported gross income to $40,879.32 to eliminate a mathematical error and that assessment was made of the additional tax liability resulting from respondent's *29 adjustment. The Morrows filed their returns for the years 1956 through 1959 on the following dates: Year
Filed
1956
Apr. 15, 1957
1957
May 2, 1958
1958
Apr. 15, 1959
1959
Apr. 15, 1960
The Morrows entered into valid [4] agreements extending the period during which the taxes for the years 1956, 1957, 1958, and 1959 could be assessed or collected until June 30, 1964. The statutory notice of deficiency was mailed to the Morrows on June 18, 1964. Petitioner Stevens Truck Lines, Inc., is a corporation organized under the laws of the State of New York and is presently located at 899 Ridge Road East, Webster, N. Y. During the taxable years in question until the latter part of 1959, Stevens' office was located at 182 North Avenue, Webster, N. Y. Stevens filed its tax returns on the accrual basis for its taxable year ending September 30, 1949, its taxable period October 1 through December 31, 1949, and its taxable years 1950 through 1959 with the district director *30 of internal revenue, Buffalo, N. Y. Stevens entered into valid and timely agreements extending the period during which the taxes for the years 1957, 1958, and 1959 could be assessed or collected until June 30, 1964. The statutory notice of deficiency was mailed to Stevens on June 18, 1964. In 1945 Stephen Morrow and Joseph Ryan formed a partnership known as Stevens Truck Lines for the purpose of operating a trucking business. Shortly thereafter, Ryan withdrew from the partnership and Stephen continued the business until the petitioner Stevens was incorporated on February 11, 1946, at which time the business was transferred to Stevens in exchange for its stock. Throughout the taxable years in question until some time on or about September 1, 1959, Stephen Morrow was the president of Stevens and owned all of the corporation's 100 issued and outstanding shares of $100 par value common stock. Doris Morrow served for the same period as Stevens' secretary-treasurer. On or about September 1, 1959, pursuant to a written agreement of that date, Stephen sold 50 shares of his Stevens stock to Anthony J. Pitts, and Stephen's remaining 50 shares were redeemed by the corporation. As consideration *31 for the redemption Stephen received all of Steven's assets except two trucks, the office equipment, and the franchises granted to Stevens by the Interstate Commerce Commission; Stephen assumed Stevens' liabilities. The purchase price of the stock sold to Pitts was $65,000, which consisted of $10,000 received by Stephen at the time of the sale and a note for $55,000. The note was payable at a rate of $1,000 a month and was secured by a mortgage or pledge of various assets owned by Pitts, including his 50 shares of Stevens stock. The sale agreement provided that Stephen was to pay any claims for taxes due from Stevens with respect to the period prior to the sale, but it was also provided that Pitts' sole remedy for Stephen's failure to pay any such claim would be the right to withhold any unpaid balance of the purchase price of the stock. During the years in question, Stevens was engaged in the business of interstate hauling and trucking of canned and frozen foods and other commodities. Stevens had a franchise granted by the Interstate Commerce Commission (hereinafter referred to as ICC) covering New York and nine other northeastern States. By the end of the years in question Stevens *32 was operating in 23 States. Stevens' trucking operations were regulated in some respects by the Public Service Commission of the State of New York (hereinafter referred to as PSC) as well as the ICC. Although in the earlier years of its existence Stevens had owned its own trucks, during the years in question the corporation's principal method of operation consisted of contracting with shippers to move goods to a certain destination and then contracting with independent truckers to move the goods. Stevens paid the owner of the truck a percentage of the transport price or a specified amount for each load. No additional inducement was offered in connection with this hauling. Stevens employed no drivers itself. In 1949 Stevens opened a small office in Boston. At that time Stevens did not have authority to haul return loads from Boston but the hauling of fresh fish out of Boston was unregulated. The invoices which Stevens used in its Boston office were marked with a "B." The Boston office was closed after a couple of months and the invoices and other forms used in Boston were brought back to Webster. After the Boston operation proved unsuccessful, Stevens began to haul return loads *33 from various sources for which it had no authority. Authority for such loads had been requested by Stevens but it was not granted until sometime later. Stevens used two sets of invoices for purposes of billing its customers. Each set of invoices bore Stevens' name and each set was numbered consecutively. The sets of invoices were identical except for the fact that the set which had originally been used in Boston bore the designation "B" in front of the numbers. (The invoices which were not so marked are referred to hereinafter as the regular invoices.) Unauthorized return loads were always billed on B invoices. Other loads were normally billed on regular invoices, but there were instances in which such other loads were billed on B invoices. Individual loads which were billed on one type of invoice were never duplicated on the other type. Most of Stevens' billings were handled by Carol Horn (hereinafter referred to as Carol), who also kept Stevens' books and performed various other office duties. Carol worked full time for Stevens from 1949 through 1956 and part time thereafter until 1959. Doris instructed Carol as to the procedures to be followed in allocating the hauling between *34 the two sets of invoices. Although Carol eventually exercised some discretion with regard to allocating specific loads, she acted in accordance with Doris' general instructions. There were some occasions during peak summer months when Doris instructed Carol that all hauling was to be billed on B invoices after a specified total of billings on regular invoices for the month was reached. Stevens maintained its books and filed its tax returns on the accrual method of accounting. The loads billed on the regular invoices were entered in Stevens' regular bound books of account, which were maintained according to ICC regulations and examined periodically by ICC inspectors. The regular books consisted of a general ledger, subsidiary expense ledger, check register, sales register, and a payroll book. The loads billed on the B invoices were entered in separate, loose-leaf books of account (hereinafter referred to as B account books) which were not shown to ICC inspectors. The B account books consisted of cash receipts and sales journal. Stephen and Doris periodically examined both sets of books. Receipts for loads billed on regular invoices and reflected in the regular books were deposited *35 in Stevens' account in the Genesee Valley Union Trust Co. (hereinafter referred to as Genesee Bank or A account). Receipts for loads billed on the B invoices and reflected in the B account books were deposited in Stevens' account in the State Bank of Ontario, Ontario, N. Y. (hereinafter referred to as Ontario Bank or B account). No deposits were made in the Ontario Bank account before 1949 or after June 1956. Occasionally a customer would remit one check in payment for a group of invoices which included both regular and B invoices. Such checks were deposited in Stevens' account at the Ontario Bank. An exchange check drawn on the Ontario Bank for the amounts shown on the regular invoices in the group would then be deposited in the Genesee Bank. This procedure was necessary in order to balance Stevens' regular books with the account in the Genesee Bank and to credit payment for bills shown in the regular books. All checks remitted in payment of both sets of invoices were made payable to Stevens and were deposited either in its account at the Genesee Bank or in its account at the Ontario Bank. Stevens did not receive any payments for hauling in the form of currency. One of Carol's *36 duties was making deposits to the account in the Ontario Bank. All the checks which she deposited to that account were payable to "Stevens Truck Lines, Inc." Carol listed the name of the payor of each check on the deposit slips. Barbara Mason (hereinafter referred to as Barbara), Carol's sister, began working part time for Stevens in 1951. Barbara worked full time for Stevens from 1952 until 1955 or 1956 and part time for some time thereafter. One of Barbara's duties was reconciling the account in the Genesee Bank. Neither Barbara nor Carol ever reconciled the Ontario Bank account. When statements and canceled checks were received from the Ontario Bank, they were placed on Doris' desk. Doris called the account in the Ontario Bank the "slush fund." No record was made in Stevens' B account books with regard to expenditures from Stevens' Ontario Bank account. Beginning in 1949 checks were drawn from that account for various expenses of Stevens' business, including claims for goods damaged in transit and payments to drivers, as well as others. Checks were also drawn on the Ontario Bank account to pay for various personal expenses and investments of the Morrows. Stevens did not claim *37 any expenditures out of the Ontario Bank account as deductions on its income tax returns. Stevens did not record any of the payments received on its B invoices and deposited in its Ontario account in its regular books of account, and did not report any of the amounts so received or any of the amounts deposited in the Ontario Bank account as income on its tax returns for any of the years here involved. Rudolph Passero (hereinafter referred to as Passero) is a public accountant in Rochester, N. Y. From the winter of 1953 until sometime after the sale to Pitts in 1959, Passero performed accounting services for Stevens. Passero also performed various services for the Morrows from 1953 through the time of the hearing in this case. In servicing Stevens' account Passero prepared a monthly operating statement, payroll tax reports, quarterly reports to PSC, corporate income tax returns, and annual reports to PSC and ICC. Passero also prepared the Morrows' personal income tax returns. Passero prepared the Federal income tax returns filed by Stevens and the Morrows for each of the years 1953 through 1959. These returns were prepared from information taken by Passero from the regular set *38 of books kept for Stevens and from additional information supplied by the Morrows. Passero generally reviewed those returns with the Morrows before they were filed. Stevens' returns for each taxable period or year through 1958 were signed by Stephen or Doris or both. Shortly after Passero was engaged in 1953, Stephen and Doris told him that Stevens had a separate bank account into which some sales receipts were being deposited and out of which some business expenses were being paid. Passero recommended that the second bank account be discontinued and that amended tax returns for previous years be filed. No amended returns were filed. A part of the receipts from Stevens' business continued to be deposited in the B account until about the middle of 1956. The information Passero used in preparing Stevens' income tax returns for the years 1953 through 1959 was obtained from Stevens' regular books of account. Through the time of the sale to Pitts in September 1959, Passero had never seen Stevens' B account books, although he may have seen one or two canceled checks on the Ontario Bank account. None of the receipts deposited in the B account and none of the withdrawals therefrom were *39 recorded on the regular books of Stevens. Claude Nunn is a special agent for the Internal Revenue Service. Nunn was assigned in July 1960 to investigate the possibility of evasion of income or other taxes on the part of Stevens or the Morrows. In September 1960 Nunn obtained the records pertaining to Stevens' regular account from Anthony Pitts. Susequently, Nunn learned of the account in the Ontario Bank and obtained from Passero all of the canceled Ontario Bank checks, which numbered approximately 10,000, and the B account cash receipts and sales journal for the years 1950 through 1953. Nunn found that Stevens' regular books agreed with its income tax returns and with the amounts deposited in the Genesee Bank account. The B account records which Nunn had for 1950 through 1953 agreed with the amounts deposited in the Ontario Bank during those years. Nunn determined that approximately $800,000 was deposited over the years 1949-1956 in Stevens' account at the Ontario Bank. The Ontario Bank had maintained a record of Stevens' deposit tickets, and Nunn attempted to contact the various payors listed on those tickets in order to determine the nature of the payments. Quite a few of *40 the checks deposited in 1955 and 1956 were verified by Nunn as representing receipts for hauling recorded only in the B account books. Stevens' income tax returns for each of the years in question reflected only the amounts shown in the regular books and deposited in the regular account in the Genesee Bank. Except for the amounts of exchange checks deposited in the Genesee Bank, no receipts deposited in the Ontario Bank were reported on Stevens' tax returns and none of the withdrawals therefrom was directly claimed as deductions on those returns. The failure to report the B account receipts on Stevens' tax returns was partially motivated, in the beginning at least, by the Morrows' desire to hide from interested regulatory agencies the fact that Stevens was hauling some unauthorized loads. A 3-percent Federal transportation tax was included on the invoices which Stevens submitted to shippers. The amounts collected for the transportation tax shown on Stevens' regular invoices were remitted to the district director of internal revenue. The amounts collected for the transportation tax shown on Stevens' B invoices were deposited in the Ontario Bank account and were not reported or remitted *41 to the district director. On May 1, 1964, an assessment was made with respect to the transportation tax attributable to receipts deposited in Stevens' Ontario Bank account. The notice of assessment listed additional tax payable in the amount of $19,919.39, additions to tax of $32,069.08, and interest of $13,699.43. The periods for which the additional transportation tax was assessed consisted of each calendar quarter from January 1, 1949, through June 30, 1956. The earned surplus of Stevens as of October 1, 1948, was $5,503.98. The property at 182 North Avenue in Webster (sometimes referred to hereinafter as the North Avenue property) was located in a commercial district and consisted of a garage used for trucks and equipment and a building that had previously been a gasoline station. Stevens' office occupied the downstairs portion of the former gasoline station, and the upstairs portion of the building was an apartment where the Morrows resided. The apartment contained five rooms and a bath and was moderately furnished. The North Avenue property was purchased by Stephen in 1946 for $7,000 and was owned by Stephen throughout the years in question. Until the time of the sale to *42 Pitts in 1959, however, Stephen thought that the property had been one of the assets transferred to Stevens when it was incorporated in 1946, and the property was treated as Stevens' asset on its books and tax returns. Stephen claimed no deduction for depreciation of the buildings during the years in question. Stevens deducted depreciation for the buildings on its tax returns for each of the years in question. Stevens paid for repairs and improvements to the buildings and deducted depreciation for some of the improvements on its tax returns for the years 1950 through 1959. Payments for utilities applicable to the North Avenue property were deducted in full on Stevens' tax returns. Stevens paid the real estate taxes on the property. Stevens did not pay Stephen any rent for the use of the North Avenue property. The Morrows did not pay Stevens any rent for the apartment which they occupied or report any amounts on their income tax returns regarding their use of the apartment. There was no lease from Stephen with respect to Stevens' use of the property. The Morrows' occupancy of the apartment above Stevens' office was necessitated by the nature of Stevens' business. Requests for trucks *43 were made at night frequently, empty and loaded trucks had to be dispatched at night frequently, and assistance had to be rendered promptly at irregular hours to drivers having difficulties. The Morrows frequently entertained Stevens' customers and drivers in their apartment. Some of Stevens' employees ate one or more meals in the Morrows' apartment each working day. Column (b) of the table below shows expenditures from Stevens' Ontario Bank account which respondent reflected in his net worth computation for the Morrows as amounts for "personal living expenses." Respondent has now conceded that certain of such expenditures were nonpersonal or were otherwise improperly treated as additional income to the Morrows. The Morrows, on the other hand, have conceded that certain of such expenditures were personal to them. The amounts shown on the following table represent the Ontario Bank expenditures respondent originally treated as additional income to the Morrows, those conceded by respondent and the Morrows, respectively, and those still in dispute: Statutory
Respondent's
Morrows'
Still In
Year
Notice
Concessions
Concessions
Dispute
(a)
(b)
(c)
(d)
(e)
1950
$ 7,662.47
$1,446.73
$3,879.48
$2,336.26
1951
12,397.53
1,388.88
4,652.14
6,356.51
1952
12,249.23
2,171.97
6,082.08
3,995.18
1953
18,541.42
7,313.10
5,162.33
6,065.99
1954
13,985.65
3,029.50
7,104.79
3,851.36
1955
12,006.65
3,513.26
4,734.67
3,758.72
1956
7,875.42
1,213.50
2,975.33
3,686.59
1957
5,150.69
577.47
3,504.82
1,068.40
1958
1,700.62
434.03
1,110.65
155.94
*44 With one exception, respondent has conceded that if the deposits in the Ontario Bank are determined to have been income to Stevens, then the amounts shown under column (c) above represent business expenses deductible by Stevens. The exception relates to an amount of $5,100 with respect to the year 1953, which respondent conceded for purposes of the Morrows' case because it was a duplication and not because it was a nonpersonal expenditure. In addition, respondent has conceded that any expenditures reflected in column (e) above which are found to have not been personal to the Morrows are also deductible by Stevens. The principal expenditures reflected in column (e) above represent checks payable to the following payees: (1) Stephen Morrow, Doris Morrow, cash, airlines or hotels; (2) Don King; (3) Webster Liquors; (4) Rochester Club; and (5) Florence Culligan. Of the amounts of checks made payable to Stephen, Doris, cash, airlines or hotels, not less than 25 percent represented expenditures for travel by the Morrows in connection with Stevens' business and bonuses paid by Stevens to its employees. Of the amounts paid to Don King and Webster Liquors not less than 50 percent represented *45 expenditures for food and liquor which the Morrows served Stevens' customers, drivers, and employees in connection with Stevens' business. Of the amounts paid to Rochester Club, not less than 75 percent represented expenditures for entertainment of Stevens' customers in connection with Stevens' business. Of the expenditures reflected in column (e) above with respect to payments to Florence Culligan, 50 percent were wages for housework in the Morrows' apartment and 50 percent were wages for running errands in connection with Stevens' business. Of the remaining expenditures reflected in column (e) above, the following amounts were nonpersonal expenditures in connection with Stevens' business for goods damaged in transit, various employee and customer gifts and entertainment, and a driver's required physical examination: Year
Amount
1950
$ 34.60
1951
812.39
1952
549.81
1953
84.84
1954
291.72
1955
166.01
1956
55.61
In the statutory notice to Stevens, respondent disallowed various deductions claimed by the corporation with respect to expenditures from the regular account at the Genesee Bank. In the statutory notices to the Morrows, respondent determined *46 that the Morrows realized additional income with respect to certain of the deductions claimed by Stevens which respondent had disallowed. The items which were treated in this manner by respondent may be placed in the following categories: [5]
(1) "Disallowed rental expense"; (2) Aquinas Institute; (3) Travel and entertainment; (4) Car insurance; (5) Personal property insurance; (6) Payments to Florence Culligan; (7) Maintenance expenses - Florida; [6]
(8) Liquor; (9) Payments to Passero. The deductions disallowed by respondent under the heading "disallowed rental expense" were not claimed by Stevens under that heading. The amounts which respondent showed under that heading consist of various deductions claimed by Stevens in connection with its occupancy of the North Avenue property. Stevens has conceded that respondent's determination with respect to the "disallowed rental *47 expense" was proper. Among the amounts disallowed to Stevens for each year through 1955 were one-half of the real estate taxes paid on the property by Stevens and one-half of the depreciation, excluding that on certain improvements, which Stevens claimed on the building in which it had its office and the Morrows had their apartment. The amount of "disallowed rental expense" for the fiscal year ending September 30, 1949, consisted of one-half the real estate taxes and one-half of the depreciation, excluding depreciation on certain improvements, claimed by Stevens with respect to the North Avenue property (hereinafter referred to as building depreciation). The amount of "disallowed rental expense" for the taxable period from October 1, 1949, through December 31, 1949, consisted of one-half of the building depreciation claimed by Stevens. For each of the taxable years 1950 through 1955, the difference between the amounts of "disallowed rental expense" in the statutory notice to Stevens and the smaller amounts charged as additional income to the Morrows consisted of one-half of the real estate taxes and one-half of the building depreciation claimed by Stevens. The payments to Aquinas *48 Institute were for football tickets distributed to Stevens' customers in connection with Stevens' business and were not personal expenditures for the Morrows. Not less than 25 percent of the amounts disallowed to Stevens and treated as additional income to the Morrows under the heading of travel and entertainment represented expenditures in connection with Stevens' business which were not personal to the Morrows. The amount disallowed to Stevens and treated as additional income of the Morrows for the year 1955 under the heading of car insurance represented premium payments for insurance on one or more automobiles. The Morrows have conceded that they realized additional income with respect to amounts disallowed to Stevens for 1956 and 1958 under the heading of personal property insurance. Stevens has conceded that such amounts were properly disallowed for 1958. Of the payments to Florence Culligan which were disallowed to Stevens and charged as additional income to the Morrows, 50 percent consisted of wages paid for housework in the Morrows' apartment and 50 percent consisted of wages for running errands in connection with Stevens' business. Of the amount disallowed under *49 the heading "liquor" for 1958, not less than 50 percent was expended in connection with Stevens' business and was not personal to the Morrows. In the statutory notice which respondent sent Stevens, one of the explanations of adjustments for the year 1959 was stated in the following terms: (a) It is held that accounting fees in the amount of $6,000.00 paid to Rudolph Passero represent a personal expense of the stockholder in 1959 and are an unallowable deduction under section 262 of the Internal Revenue Code of 1954. For several years prior to the time of the sale to Pitts in 1959 Passero performed certain services in addition to those required under his normal arrangement with Stevens. Stephen requested that Passero hold his fee for the additional work in abeyance until Stephen sold the business, and Passero agreed. A bill for the additional work in the amount of $6,000 was submitted to Stevens in 1959. That bill included work performed by Passero on several occasions in connection with meeting prospective buyers of the business. Also included in the bill were services performed in connection with an examination concerning the State truck mileage tax. *50 Stevens made a partial payment on the bill by transferring a 1957 Imperial to Passero sometime in 1959 prior to the sale to Pitts. [7] Passero valued the Imperial at $3,050 and credited that amount on his bill to Stevens. The balance of the bill was paid by Stevens in 1959 with its check in the amount of $2,950. Of the total amount of $6,000 which Stevens paid Passero for his additional services not less than $1,500 represented payment for services other than those involved in Stephen's attempts to sell the business. Findings of Fact Stephen L. and Doris M. Morrow During the years in question Stephen was engaged in two business enterprises in addition to his employment with Stevens. Stephen owned a patent on a lock which was manufactured for him by someone else. A few of the locks *51 were sold. No income from the sale of locks was reported on the tax returns filed by Stephen and Doris. Stephen's other business was known as Produce Transportation Lines (hereinafter referred to as Produce). Produce was a seasonal operation which Stephen conducted during the spring of each of the years in question as an accommodation to those of Stevens' customers who had produce that needed to be shipped. Carol maintained a set of records for the activities of Produce, and those activities were not recorded in either of Stevens' two sets of books. There was a separate bank account in the Genesee Bank in the names of Produce and Stephen. All of the receipts and disbursements by Produce were by check, and the deposits to its bank account constituted an accurate record of its receipts. Although Passero had some knowledge of the existence of Produce, he was not aware of the records or the bank account of Produce until after the years in question. Passero never prepared any returns or statements for Produce. No income from Produce was reported on the returns filed by Stephen and Doris. Claude Nunn, the special agent, received the bank book and ledger cards for Produce in the course *52 of his investigation, but did not receive any other records relating to Produce. Nunn received some, but not all, of the records and checks relating to the Morrows' personal bank accounts. Nunn made one appointment to meet with the Morrows but the appointment was not kept and no further efforts were made to meet with them. Stephen Morrow received an inheritance of $305.10 from the estate of Louis J. Phillips in 1950. Acting as administrator of his father's estate, Stephen filed in 1954 an application for a determination of the tax payable to the State of New York on the assets of the estate. On that document Stephen reported his father's gross estate at a value of $15,215.36. Funeral and administration expenses were listed as $2,071.50. Debts of the estate were shown as $2,631.75, including $2,565.48 owed to Stephen for money advanced. The beneficiaries of the residue of the estate in the amount of $10,512.11 were listed as Stephen, Catherine Pica, and Adelaide Giaconia in the respective amounts of $3,504.03, $3,504.04, and $3,504.04. Catherine Pica and Adelaide Giaconia were shown to be daughters of Stephen's father. Respondent has determined that the Morrows had the assets *53 and liabilities shown on the following table as of December 31 of each of the years 1949 through 1959: ASSETS
12/31/49
12/31/50
12/31/51
12/31/52
Cash on hand
Cash in banks: Personal accounts
$ 6,242.14
$ 5,596.45
$ 7,390.83
$11,687.80
Produce transporta-
tion
1,504.40
1,390.24
1,471.36
1,105.70
Stevens Truck Lines
- Morrow
Investments: Stevens Truck Line,
Inc. - Stock
10,000.00
10,000.00
10,000.00
10,000.00
Stocks - Brokers
11,142.53
Credit balance - Bro-
kerage acct.
Notes Receivable: Stevens Truck Line
4,344.86
13,601.88
10,601.88
6,601.88
Richards Note
Tom Edwards
Mortgage Receivable: Anthony Pitts
Real Estate: Bldg. & Land - 182
North Ave.
22,600.00
24,129.10
30,610.81
31,371.83
Less: Reserve for de-
preciation
(677.25)
(941.25)
(1,205.25)
(1,469.25)
Florida real estate
Total Assets
$44,014.15
$53,776.42
$58,869.63
$70,440.49
LIABILITIES
Debit balance - Broker-
age accts.
Notes payable - Stevens
Truck Line
Mortgages payable -
Florida realty
Accounting fee - R. J.
Passero
Total Liabilities
Net Worth
$44,014.15
$53,776.42
$58,869.63
$70,440.49
Increase in Net Worth
$ 9,762.27
$ 5,093.21
$11,570.86
*54 ASSETS
12/31/53
12/31/54
12/31/55
Cash on hand
Cash in banks: Personal accounts
$ 7,489.19
$ 2,121.90
$ 2,291.17
Produce transporta-
tion
811.75
587.76
1,675.99
Stevens Truck Lines
- Morrow
Investments: Stevens Truck Line,
Inc. - Stock
10,000.00
10,000.00
10,000.00
Stocks - Brokers
17,048.81
32,098.92
27,512.15
Credit balance - Bro-
kerage acct.
Notes Receivable: Stevens Truck Line
12,601.88
12,601.88
9,701.88
Richards Note
Tom Edwards
Mortgage Receivable: Anthony Pitts
Real Estate: Bldg. & Land - 182
North Ave.
31,371.83
31,371.83
31,371.83
Less: Reserve for de-
preciation
(1,733.25)
1,997.25)
(2,261.25)
Florida real estate
150.00
14,349.50
14,717.00
Total Assets
$77,740.21
$101,134.54
$95,008.77
LIABILITIES
Debit balance - Broker-
age accts.
$ 11,119.00
$ 474.89
Notes payable - Stevens
Truck Line
Mortgages payable -
Florida realty
Accounting fee - R. J.
Passero
Total Liabilities
$ 11,119.00
$ 474.89
Net Worth
$77,740.21
$ 90,015.54
$94,533.88
Increase in Net Worth
$ 7,299.72
$ 12,275.33
4,518.34
ASSETS
12/31/56
12/31/57
12/31/58
12/31/59
Cash on hand
Cash in banks: Personal accounts
$ 26,099.60
$ 12,169.76
$ 8,961.68
$ 32,195.66
Produce transporta-
tion
1,350.76
1,647.01
1,707.55
0
Stevens Truck Lines
- Morrow
31,032.62
Investments: Stevens Truck Line,
Inc. - Stock
10,000.00
10,000.00
10,000.00
10,000.00
Stocks - Brokers
49,301.26
19,977.72
59,638.10
69,632.97
Credit balance - Bro-
kerage acct.
3,543.02
Notes Receivable: Stevens Truck Line
1,50
3,390.00
973.21
0
Richards Note
5,000.00
Tom Edwards
1,900.00
Mortgage Receivable: Anthony Pitts
52,677.85
Real Estate: Bldg. & Land - 182
North Ave.
31,371.83
31,371.83
31,371.83
31,371.83
Less: Reserve for de-
preciation
(2,525.25)
(2,789.25)
(3,053.25)
(3,229.25)
Florida real estate
41,780.88
44,780.88
88,830.88
88,830.88
Total Assets
$157,380.58
$124,090.97
$198,430.00
$309,412.56
LIABILITIES
Debit balance - Broker-
age accts.
$ 15,960.70
0
$ 19,360.75
$ 23,417.63
Notes payable - Stevens
Truck Line
9,881.54
Mortgages payable -
Florida realty
11,986.02
$ 11,425.44
31,832.86
24,205.69
Accounting fee - R. J.
Passero
2,915.00
Total Liabilities
$ 37,828.26
$ 11,425.44
$ 51,193.61
$ 50,538.32
Net Worth
$119,552.32
$112,665.53
$147,236.39
$258,874.24
Increase in Net Worth
25,018.44
(6,886.79)
34,570.86
111,637.85
*55 The parties [8] have stipulated the amounts shown for cash in banks, the credit balance in brokerage accounts for 1957, the notes receivable, the mortgage receivable, and the Florida real estate. The amounts shown for the building and land at 182 North Avenue were stipulated to be the amounts shown on Stevens' books, but the Morrows do not concede the correctness of including the increases in cost shown for 1950, 1951, and 1952 in their net worth. The liabilities for debit balances in brokerage accounts were stipulated for each applicable year except 1955. The notes payable and mortgages payable were stipulated. Stephen borrowed $22,000 from the Genesee Bank on January 28, 1946, to finance the formation of Stevens. As collateral for the loan, Stephen pledged a $10,000 life insurance policy and gave a mortgage on various tractors, trailers, and other equipment. During the period July 23, 1946, through March 3, 1952, Stevens periodically borrowed money for working capital and payroll requirements from the Genesee Bank. Stephen endorsed each of the notes evidencing such loans. *56 On May 1, 1952, and September 2, 1954, Stephen submitted financial statements to the Genesee Bank. The space on each of those statements where cash on hand was to be recorded was left blank and the word "none" was entered in the liabilities column. In addition to borrowing money to put into Stevens in 1946, Stephen sold the assets he had purchased with funds accumulated over the years prior to that time. He sold his bonds, a cottage, and his car. Stephen also obtained some money from his father. At the time Stevens was incorporated, Stephen contributed assets valued at $10,000 in exchange for the corporation's stock. During the period between February 11, 1946, and December 31, 1949, Stephen periodically made contributions to Stevens' capital. As of December 31, 1949, the total amount of Stephen's contributions to Stevens' capital was not less than $14,818.52. The following table shows the amounts recorded with respect to the common stock and paid-in or capital surplus on Schedule L of Stevens' tax returns: Paid-in or
Common
capital
Year
stock
surplus
Sept. 30, 1949
$10,000
$14,818.52
Oct. 1-Dec. 31, 1949
10,000
25,318.52
1950-1958
10,000
25,318.52
1959
10,000
25,318.52
*57 Of the cost of stock purchased from brokers which is included on the table of assets above, $2,720.20 was paid out of Stevens' Ontario Bank account in 1952. The table of assets above includes an amount of $12,588.37 for December 31, 1956, with respect to 350 shares of Magnavox stock which were shown on the broker's statement to have been purchased on December 31, 1956. The table of assets above includes an amount of $10,745.44 for December 31, 1958, with respect to 250 shares of North American Aviation stock which were shown on the broker's statement to have been purchased on December 31, 1958. The parties have stipulated that the amounts which Stevens paid for improvements to the North Avenue property were those shown on the table below: Ontario
Genesee
Year
Bank
Bank
Total
1950
$1,229.10
$ 300.00
$1,529.10
1951
4,574.34
2,597.70
7,172.04 *
1952
773.03
773.03 **
1959
1,667.50
1,667.50 ***
*58 Part of the amount treated as consideration for Stevens' redemption of Stephen's stock in 1959, a transaction reported on the Morrows' return for that year, was the depreciated cost of improvements to the North Avenue property in the amount of $1,813.93. Of the amounts shown on the table of assets above with respect to the cost of Florida real estate the following amounts were drawn from Stevens' Ontario Bank account: Year
Amount
1953
$ 150.00
1954
12,849.50
1955
367.50
1956
15,003.68
1957
2,500.00
The records maintained by Stephen's stockbroker showed a debit balance in Stephen's margin account as of December 31, 1955, in the amount of $10,850.60. That amount was decreased by respondent by an adjustment in the amount of $10,375.71 to reflect the sale in December 1955 of shares of stock in four companies which were not included in the amounts of stock owned as of December 31, 1955, on the table of assets above. The sale of those shares was reflected on the broker's record of Stephen's margin account sometimes after December 31, 1955. The sales of three of the blocks of stock in question were reported on the Morrows' return for 1955 with indicated dates *59 of sale in each instance of December 27 or 28. Payments on the mortgages payable on Florida real estate were drawn from Stevens' Ontario Bank account in the following amounts: Year
Amount
1956
$ 704.27
1957
1,207.30
1958
1,207.30
1959
1,207.30
The following table shows, after adjustments for his concessions, respondent's determination regarding the Morrows' annual increases in net worth, their annual nondeductible personal expenditures, adjustments for deductions and nontaxable receipts, and the computation of the Morrows' unreported income: 1950
1951
1952
1953
1954
Increase in Net
$ 9,762.27
$ 5,093.21
$11,570.86
$ 7,299.72
$12,275.33
Worth: [1]
Add: Nondeductible
personal
expenditures: [2]
Estimated deductions
475.00
490.00
593.09
792.46
1,000.00
- p. 3 of return
Payments for
4,915.50 [3]
600.00
3,494.21
400.00
5,950.00
automobiles
1959 Cadillac -
received from Stevens
9/1/59
Payments for boats
2,657.85
0
1,762.10
8,000.00
Federal income tax
403.25
873.75
1,032.72
1,269.14
1,281.00
paid
Insurance payments -
personal
Portion capital loss
- not deductible
Personal living
6,215.74
11,008.65
10,077.26
11,228.32
10,956.15
expense - Ontario
account
Personal living
4,341.61
5,446.46
3,558.34
3,841.03
4,144.06
expense - personal
accounts
Personal living
434.79
398.09
328.96
614.47
451.41
expense - disallowed
in Corporation
Purchase of airplane
Estimated living
500.00
500.00
500.00
500.00
500.00
expense
Total Expenditures
$17,285.89
$21,974.80
$19,584.58
$20,407.52
$32,282.62
Total Expenditures
and Net Worth
Increase:
$27,048.16
$27,068.01
$31,155.44
$27,707.24
$44,557.95
Deduct: Portion capital gains
179.22
167.33
0
- not taxed
Nontaxable dividends
100.00
& exclusions
Capital loss
carryover
Portion Pitts
mortgage not taxable
in 1959
Sick pay exclusion
Standard deduction
1,000.00
1,000.00
1,000.00
1,000.00
1,000.00
Inheritance - Stephen
305.10
Total Deductions:
$ 1,305.10
$ 1,000.00
$ 1,179.22
$ 1,167.33
$ 1,100.00
Corrected Net Income
$25,743.06
$26,068.01
$29,976.22
$26,539.91
$43,457.95
Less: Reported Net
4,275.00
4,410.00
5,337.84
7,132.10
Income 1950-53
Additional Net Income
$21,468.06
$21,658.01
$24,638.38
$19,407.81
1950-53
Less: Exemptions
1,200.00
1954-59
Corrected Taxable
$42,257.95
Income 1954-59
Less: Reported
10,928.59
Taxable Income
1954-59
Additional Taxable
$31,329.36
Income 1954-59
*60 1955
1956
1957
1958
1959
Increase in Net
$ 4,518.34
$25,018.44
[6,886.79)
$34,570.86
$111,637.85
Worth: [1]
Add: Nondeductible
personal
expenditures: [2]
Estimated deductions
- p. 3 of return
Payments for
2,300.00
6,551.00
0
6,404.61
automobiles
1959 Cadillac -
received from Stevens
9/1/59
5,916.00
Payments for boats
Federal income tax
3,288.21
4,391.52
3,766.98
10,430.16
7,968.92
paid
Insurance payments -
2,324.00
personal
Portion capital loss
17,177.35
- not deductible
Personal living
8,493.07
6,661.92
4,573.22
1,266.59
expense - Ontario
account
Personal living
2,089.80
1,762.44
6,051.23
9,258.15
13,050.57
expense - personal
accounts
Personal living
407.28
1,861.02
3,943.42
5,294.29
9,025.48
expense - disallowed
in Corporation
Purchase of airplane
8,500.00
Estimated living
500.00
500.00
500.00
500.00
500.00
expense
Total Expenditures
$17,078.36
$21,727.90
$36,012.20
$35,477.80
$ 44,960.97
Total Expenditures
and Net Worth
Increase:
$21,596.70
$46,746.34
$29,125.41
$70,048.66
$156,598.82
Deduct: Portion capital gains
968.06
2,663.90
0
0
21,664.46
- not taxed
Nontaxable dividends
100.00
100.00
100.00
100.00
100.00
& exclusions
Capital loss
8,307.33
8,870.02
carryover
Portion Pitts
48,621.66
mortgage not taxable
in 1959
Sick pay exclusion
1,300.00
Standard deduction
Inheritance - Stephen
Total Deductions:
$ 1,068.06
$ 2,763.90
$ 100.00
$ 8,407.33
$ 80,556.14
Corrected Net Income
$20,528.64
$43,982.44
$29,025.41
$61,641.33
$ 76,042.68
Less: Reported Net
Income 1950-53
Additional Net Income
1950-53
Less: Exemptions
1,200.00
1,200.00
1,200.00
1,200.00
1,200.00
1954-59
Corrected Taxable
$19,328.64
$42,782.44
$27,825.41
$60,441.33
$ 74,842.68
Income 1954-59
Less: Reported
15,731.84
13,705.44
8,366.49
39,279.67
33,168.41
Taxable Income
1954-59
Additional Taxable
$ 3,596.80
$29,077.00
$19,458.92
$21,161.66
$ 41,674.27
Income 1954-59
*61 The parties have stipulated the amounts paid for automobiles, but the Morrows do not concede that all such expenditures were personal. The amounts paid for boats in 1951 and 1954 were stipulated and the amount spent in 1953 is not disputed. The amount paid for boats in 1951 was drawn from Stevens' Ontario Bank account. The Federal income tax payments, the nondeductible capital loss in 1957, and the purchase *62 price of the airplane in 1959 were stipulated; and the insurance payment in 1958 and the personal living expenses paid from personal bank accounts are not disputed. The 1959 Cadillac was received from Stevens in 1959 as part of the consideration for the redemption of Stephen's stock, a transaction reported on the Morrows' tax return for 1959. At most times during the years in question two automobiles of various makes were owned by Stevens or the Morrows. One of the automobiles would be a De Soto or Chrysler station wagon and the other a Cadillac, Chrysler, or Imperial convertible. The station wagon was used by Florence and other employees to run errands for Stevens. Stephen used the convertible. Stephen drove when he visited those of Stevens' customers who were located in the area around Webster. Although Stephen drove to New York a couple of times to see customers, he normally flew when he attended conventions or visited customers who were located outside of the area around Webster. Stephen had a bad back which prevented his driving long distances. The Morrows normally flew when they took vacations to Florida, but they went to Florida by automobile twice. On those two occasions, *63 Florence drove because Stephen could not. Doris did not drive until 1956 or 1957. The automobile insurance premiums and the expenses of operating the automobiles were paid by Stevens. The Morrows did not claim deductions for depreciation of automobiles on their tax returns for the years in question. With the exception of the 1959 Cadillac for the period prior to September 1, 1959, title to all automobiles reflected in the table of expenditures above was in Stephen's name. Of the amount paid for automobiles in 1954, $5,850 represented a check drawn on Stevens' Ontario Bank account in partial payment for a 1954 Cadillac. Of the amounts paid for automobiles in 1955, $2,000 represented a check drawn on Stevens' Ontario Bank account in partial payment for a Rolls Royce and $300 represented a check drawn on Stevens' Ontario Bank account in payment for an unidentified purpose to Ward Maurer, Inc., a Chrysler dealer in Rochester. With the exception of the 1959 Cadillac, all of the other payments for automobiles were made from the Morrows' personal funds. Stephen and Doris had no income in the form of currency, although they did make various cash purchases. Checks made payable to "cash" *64 which were drawn on the bank accounts of Stevens and the Morrows are included in the amount of personal living expenses shown on the table above. The net amount (assets received less liabilities assumed) realized by Stephen upon the redemption of his stock by Stevens in 1959 appears to have been $40,495.39, as computed on Exhibit 11. We have found that the Morrows' total basis in the stock of Stevens was $24,818.52. Attributing one-half of this basis, or $12,409.26, to the stock that was redeemed, the Morrows realized a gain of $28,086.13 on the redemption of 50 percent of their stock by Stevens. In the net worth computation of the Morrows' income for 1959, 50 percent of the long-term capital gain, or $14,043.07, should be deducted as nontaxable income from the redemption, [9] and any other adjustments to the gain reported by the Morrows required to reflect our above findings shall also be made. *65 On April 9, 1962, Stephen and Doris pleaded guilty to a charge of filing a false and fraudulent joint income tax return for the year 1959, and to a charge of filing as officers of Stevens a false and fraudulent corporate income tax return for the year 1956. Stephen was given a suspended sentence and placed on probation for 1 year, and both Doris and Stephen were fined $2,500 on each charge. Findings of Fact Stevens Truck Lines, Inc. Respondent determined that Stevens had additional, unreported net income in the following amounts with respect to the receipts deposited in Stevens' Ontario Bank account: Period
Amount
1/1-9/30/49
$ 3,589.25
10/1-12/31/49
10,386.63
1950
30,620.43
1951
36,814.43
1952
47,713.83
1953
43,686.33
1954
27,369.49
1955
12,910.46
1956
6,963.48
Respondent deducted the accrued transportation tax and the payments he could identify as having been paid to drivers from this account from net deposits [10] in determining the additional net income shown above. Respondent's determination was made on a cash basis except that hauling receipts were accrued where available invoices showed the proper time for accrual. *66 Respondent subsequently conceded that Ontario Bank expenditures in the amounts shown on the following table are deductible by Stevens if it is determined that amounts deposited in the Ontario Bank account constituted income to Stevens: Year
Amount
1950
$1,446.73
1951
1,388.83
1952
2,171.97
1953
2,213.10
1954
3,029.50
1955
3,513.26
1956
1,213.50
1957
577.47
1958
434.03
In view of respondent's concession that any additional Ontario Bank expenditures which the Court finds to be nonpersonal to the Morrows are deductible by Stevens, the findings made previously herein that certain other Ontario Bank expenditures were nonpersonal to the Morrows may be used in determining the amounts deductible from the additional income shown above. Respondent also determined that Stevens had additional income in the following amounts as a consequence of Stevens' having improperly claimed various deductions on its tax returns: Year
Amount
9/30/49
$ 260.38
10/1-12/31/49
66.00
1950
807.37
1951
726.61
1952
703.95
1953
7,143.04
1954
6,388.46
1955
4,179.52
1956
8,504.41
1957
27,450.42
1958
6,058.31
1959
10,053.56
Included in the *67 amounts so disallowed by respondent were certain amounts which respondent also treated as personal expenditures of the Morrows. Those amounts were previously described herein as part of the General Findings of Fact. Included also in the deductions which respondent disallowed were the following deductions claimed by Stevens for depreciation of yachts: Year
Amount
1953
$1,040.63
1954
1,340.62
1955
720.00
1956
300.00 Customers of Stevens were entertained on the yachts for which depreciation was claimed by Stevens. A yacht was purchased in each of the years 1951, 1953, and 1954, and the purchase price in each instance was paid in full or in part from Stevens' funds. The deductions for depreciation claimed by Stevens were computed on the portion of the purchase price of the yacht paid with Stevens' funds. Among the deductions claimed by Stevens and disallowed by respondent for each of the years 1953 through 1959 were life insurance premiums. The explanation of the disallowance for 1953 cited section 24(a)(4) of the 1939 Code. The explanations of the disallowances for 1954 through 1959 cited section 264(a) of the 1954 Code. Stevens conceded that the life insurance *68 premiums were not deductible for the years 1957 through 1959. Among the deductions claimed by Stevens and disallowed by respondent for each of the years 1953 through 1957 were bonuses paid to officers. The explanation of the disallowance for 1953 cited section 24(c) of the 1939 Code. The explanations of the disallowances for 1954 through 1957 cited section 267(a)(2) of the 1954 Code. Stevens conceded that the officers' bonuses were not deductible for 1957. Among the deductions disallowed for the year 1959 was a deduction of $758.90 for legal expense, which was disallowed "on the basis that it represented a capital expenditure to Anthony Pitts in acquiring Stevens Truck Lines, Inc. stock." Ultimate Findings of Fact At least a part of the deficiency or underpayment of tax by Stevens for each of its taxable periods or years ending September 30, 1949, and December 31, 1949, through 1956 was due to fraud with intent to evade tax and each of the income tax returns of Stevens for those years was a false or fraudulent return with intent to evade tax. At least a part of the deficiency or understatement of tax by the Morrows for each of the taxable years ending December 31, 1949, through *69 1959, was due to fraud with intent to evade tax, and each of the income tax returns of the Morrows for those years was a false or fraudulent return with intent to evade tax. Opinion Our task in these consolidated cases is more difficult than usual for several reasons. Respondent determined the deficiencies against the corporation, Stevens, by adding to its reported income unreported cash receipts, and by disallowing claimed deductions on the ground that the expenditures were for the prsonal benefit of the Morrows and were not deductible business expenses of Stevens. On the other hand, respondent determined the deficiencies against the Morrows on the net worth plus non-deductible expenditures method. Although the most likely source of the unreported income determined against the Morrows was the unreported cash receipts determined against Stevens, no effort was made by respondent to relate the income of the Morrows to the unreported income of Stevens. The Morrows claim that we should ignore the net worth method of reconstructing their income and determine it by adding to their reported income the unreported income of Stevens less the deductions properly allowable against it. Had *70 the Morrows kept the records necessary to make such a computation accurately this might have been a more desirable method of determining the taxable income of both Stevens and the Morrows because the Morrows have argued that some of their withdrawals of Stevens' income may have been nontaxable because they were not out of Stevens's earnings and profits. However, such records were not made available, and respondent was entitled to use whatever method of reconstructing income he thought would best reflect the Morrows' correct taxable income. Holland v. United States, 348 U.S. 121, 132. In addition, there is evidence that the Morrows may have received taxable income from other sources than Stevens, so it cannot be said that respondent's determinations by the net worth method were arbitrary or unreasonable. We feel that on the evidence presented the net worth method of reconstructing the Morrows' income will be more accurate than any other method suggested by the Morrows and we have proceeded accordingly. The burden will have to be on the Morrows, if they wish to shoulder it, to show on the Rule 50 computations that Stevens' earnings and profits were less than the income *71 they received from Stevens. The question of whether or not the taxability of such income to the Morrows is dependent upon the existence of earnings and profits in Stevens will not be decided until such a showing is made. Another reason our task has been more difficult is that Stevens, understandably so, entered into only a very meager stipulation of facts and respondent has, in some instances, failed to offer evidence to prove facts against Stevens which the Morrows agreed to by stipulation. It thus was necessary for the Court to rather carefully sift the evidence that could be used by respondent in carrying his burden of proof of fraud against Stevens for the years 1949 through 1956. Stevens concedes that the statute of limitations does not bar assessment of any deficiencies that may be determined against it for the years 1957, 1958, and 1959, and respondent concedes that Stevens' returns were not fraudulent for those years. The statute of limitations bars assessment of any deficiencies against Stevens for the years 1949 through 1956 unless respondent proves fraud, and Stevens relies almost entirely on respondent's failure to prove fraud by the requisite clear and convincing proof *72 to support its position for those years. Under the above circumstances we will first discuss whether respondent has proven fraud against Stevens for the years 1949 through 1956 by evidence that was usable with respect to this issue, so there will be less question of just what evidence we have considered on this issue. Stevens was represented by counsel throughout the trial of the case and had an opportunity to object to evidence, cross-examine witnesses, and offer its own evidence. We will discuss the various items involved in arriving at the taxable income of the petitioners; it will be left to the parties to compute the taxable income of petitioners in the light of our conclusions. Stevens Truck Lines, Inc.
The Statute of Limitations Because of the provisions of section 275(a), I.R.C. 1939, and section 6501(a), I.R.C. 1954, assessment of the deficiencies and additions to tax which respondent has determined to be payable for Stevens' taxable periods or years prior to 1957 is barred, unless it is determined that for each of those periods Stevens filed a *73 "false or fraudulent return with the intent to evade tax." Sec. 276(a), I.R.C. 1939; sec. 6501(c)(1), I.R.C. 1954. [11] The burden of proving that Stevens "has been guilty of fraud with intent to evade tax" is upon respondent. Sec. 1112, I.R.C. 1939; sec. 7454, I.R.C. 1954. In order to sustain his statutory burden of proving fraud, respondent must prove it by clear and convincing evidence. L. Glenn Switzer, 20 T.C. 759, 764; Arlette Coat Co., 14 T.C. 751, 756. Moreover, respondent must make the required showing with respect to each year in question, because "proof of fraud for one year will not sustain the respondent's burden of proving fraud in another year." Thomas J. McLaughlin, 29 B.T.A. 247, 249. Respondent contends that Stevens filed false and fraudulent returns with the intent to evade tax for each of the periods *74 in question prior to 1957 because Stevens knowingly failed to report on those returns amounts received for hauling which were deposited in its Ontario Bank account. [12]
We have found as a fact that Stevens' tax returns did not reflect any of the amounts deposited in its Ontario Bank account, other than those amounts withdrawn by exchange checks deposited in its Genesee Bank account. It is also clear that any understatements of Stevens' income occasioned by the failure to report those deposits on its returns were simply the final step in a system of double bookkeeping over which the Morrows had complete control and "the *75 likely effect of which would be to mislead or conceal." Spies v. United States, 317 U.S. 492. We are persuaded that the Morrows were fully aware of all aspects of that system of bookkeeping from the invoice to the tax returns and during the entire period of its existence. That the failure to include all of Stevens' hauling receipts in its tax returns may have had its genesis in an attempt to hide the fact that Stevens was engaging in unauthorized hauling is irrelevant. Arctic Ice Cream Co., 43 T.C. 68, 74. The Morrows' refusal to file amended returns when advised to do so by Passero in 1953 is strong evidence of their fraudulent intent. Cf. George M. Still, Inc., 19 T.C. 1072, affirmed per curiam 218 F. 2d 639. In light of these facts, which we have found from the non-stipulated evidence received at the trial, we are compelled to conclude that to the extent that Stevens' taxes for the years in question were not fully paid, the Morrows not only knew of the underpayments but intended them in order to evade taxes. The knowledge and intention of its principal officers and sole shareholder must be attributed to Stevens. Auerbach Shoe Co., 21 T.C. 191, *76 affd. 216 F. 2d 693. Respondent has shown convincingly the existence of an intent to evade tax on the part of Stevens. In fact, Stevens has never seriously disputed the existence of such an intent. The real dispute between respondent and Stevens involves the question of whether or not respondent was required to prove more than this. Stevens maintains that respondent must prove not only that Stevens' actions were motivated by fraudulent intent but also that those actions resulted in an understatement of Stevens' taxable income for each year in question. Stevens contends that respondent has failed to show that Stevens' taxable income was understated for any particular year. Moreover, although Stevens concedes that the evidence shows deposits in the Ontario Bank account of some $800,000 over the years 1949-1956, it contends that respondent has failed to prove the amounts so deposited in any of these taxable periods. Respondent takes the position that he is required to prove only the fraudulent nature of Stevens' conduct and that Stevens' argument that respondent's burden is more extensive confuses the burden of proving fraud, which is on respondent, with the burden *77 of proving the deficiencies erroneous, which is on Stevens. Under the circumstances of this case we are of the opinion that the scope of respondent's burden of proof is neither as broad as Stevens would have it nor as limited as respondent contends. Although respondent's burden does not require him to prove the exact amount of income which Stevens failed to report, Estate of W. Y. Brame, 25 T.C. 824, affirmed per curiam 256 F. 2d 343, he is required to show for each year in question that Stevens realized some taxable income which it failed to report and that the failure to report it was due to fraud. W. A. Shaw, 27 T.C. 561, affd. 252 F. 2d 681. The critical question is whether respondent must specifically prove unreported taxable income for each year involved, or whether respondent can carry his burden of proof by proving that Stevens received unreported gross income in each year which it did not report, with the burden being left to Stevens to prove deductible expenditures that would offset the unreported income. Under the circumstances of this case we find that respondent has carried his burden of proving fraud by clear *78 and convincing evidence by proving that Stevens systematically omitted from its regular books and records and from its tax returns throughout the period 1949 through 1956 sizable amounts of gross income, without having to prove that Stevens did not have deductible expenditures, in addition to those recorded in its books of account and claimed on its returns, that would equal the unreported gross income. When respondent has proved by clear and convincing evidence that Stevens deliberately failed to report gross income from its business activities with the purpose and intent to evade tax thereon, respondent has established a prima facie case of fraud; and respondent is not required to prove the negative - that unclaimed deductions did not equal the unreported gross income - where the taxpayer failed to keep or disclose records of its unclaimed expenditures, if any. We do not believe that W. A. Shaw, supra, relied upon by Stevens, stands for the contrary. While the Court said in its opinion in the Shaw case, at 27 T.C. 570, Respondent must affirmatively show that there were deficiencies for the years barred by the statute of limitations, and that such difficiencies *79 were due to fraud. * * *
a careful analysis of the Court's opinion reveals that the only question in that case was whether a part of the unreported income was attributable to each of the years involved. Any part of the unreported income resulted in a deficiency for the year to which it was attributable and the opinion was not concerned with what respondent has to prove in addition to unreported income to establish a deficiency for a particular year. We have found that payments for hauling recorded in Stevens' B account books which were deposited in its Ontario Bank account were not reported on Stevens' tax returns. The essence of Stevens' argument is that respondent was required to prove for each year in question the minimum amount deposited and the maximum amount of allowable deductions. This degree of proof was not required. Leonard B. Willits, 36 B.T.A. 294; L. Schepp Co., 25 B.T.A. 419. Cf. Jackson v. Commissioner, 380 F. 2d 661, affirming a Memorandum Opinion of this Court; Bryan v. Commissioner, 209 F. 2d 822, affirming a Memorandum Opinion of this Court; Harris v. Commissioner, 174 F. 2d 70, affirming *80 per curiam a Memorandum Opinion of this Court. "The Commissioner need only show that part of the asserted deficiency is due to the fraud on which the Commissioner relies." Kreps v. Commissioner, 351 F. 2d 1, 6, affirming 42 T.C. 660. To the extent that respondent has proved that deposits were made in the Ontario Bank account during a particular year, he has established prima facie that Stevens' return for that year was false. At that point the burden of going forward shifted to Stevens to produce evidence that the amounts deposited were offset entirely by allowable deductions. Sidney Kreps, 42 T.C. 660, 666-67, affirmed 351 F. 2d 1; cf. Louis Halle, 7 T.C. 245, 251, affirmed 175 F. 2d 500, certiorari denied 338 U.S. 949. We must now decide whether respondent has proved that deposits were made to that account during each of the years in question. It is at this point that the problem of maintaining the separate identity of the Morrows and Stevens and their respective stipulations of facts to which we have alluded previously, is most relevant. In the stipulation of facts between respondent *81 and the Morrows (hereinafter referred to as the Morrow stipulation) those parties stipulated the following facts concerning the Ontario Bank account: (1) That the account was opened on March 28, 1949, and closed on September 11, 1959; (2) the gross amounts deposited in the account during Stevens' taxable periods ending September 30, 1949, and December 31, 1949, and during each of the taxable years 1950 through 1956; and (3) that a stipulated exhibit attached to the Morrow stipulation consisted of photostatic copies of the Ontario Bank's ledger sheets of Stevens' account. These details are not available anywhere in the record except in the Morrow stipulation. Stevens maintains that the Morrow stipulation does not constitute evidence in Stevens' case. Although we agree with Stevens in that regard, we cannot accept its further argument that there is no other evidence showing that deposits were made in the Ontario Bank account during any particular year. Stephen testified that the Ontario Bank account was opened in 1949 after the Boston business failed and that thereafter receipts from unauthorized return hauls were deposited in that account. Carol Horn testified that a separate set *82 of books was kept with respect to the deposits in this account starting in 1949 and extending at least through June of 1956. Her testimony indicates that this was standard procedure throughout the years 1949-1956. Perhaps she did not testify specifically that there were receipts deposited in the account in each individual year, but the inference is clear that such was the case. Carol's testimony is also corroborated by the testimony of her sister, Barbara Mason. Special Agent Nunn testified that he had obtained the deposit slips maintained by the Ontario Bank for the Stevens' account, and he also had access to the Stevens' "B" account books for the years 1950-1953. Nunn testified that the deposit slips indicated that over $800,000 had been deposited in Stevens' Ontario account during the period 1949-1956. He also testified that he determined the unreported sales added to Stevens' income in the notice of deficiency issued to it by taking all of the deposits in the Ontario account for each year and deducting therefrom all expenditures paid therefrom which he could identify as business expenditures. The net amounts are reflected in the notice of deficiency issued to Stevens as unreported *83 sales in each of the years 1949 through 1956. The amounts are sizable in each of those years. Nunn also testified that the deposits in the Ontario account during each of the years 1950-1953, as determined from the bank records, agreed with the deposits reflected in Stevens' "B" account books for each of those years, clearly indicating that there were deposits in that account during each of those years. Nunn also testified that he had been able to identify a number of the individuals or firms whose checks had been deposited in the Ontario account in 1955 and 1956 as customers of Stevens and that these checks were business receipts of Stevens which were not reported on its returns. Petitioners' Exhibit 3 was received in evidence at the trial without objection by Stevens. This exhibit was a schedule showing the amount of additional Federal transportation tax due from Stevens computed on Stevens' deposits in its Ontario account. We are not concerned with the accuracy of this computation but only that it is some evidence that there were deposits in the Ontario account in each of the years 1949 through 1956. The oral testimony and other evidence received in open Court, taken as a *84 whole, is clear and convincing that throughout the period 1949 until about the middle of the year 1956, all of Stevens' receipts for unauthorized hauls were deliberately and systematically deposited in the Ontario account and were not entered on Stevens' regular books of account, that this was a practice that was followed consistently throughout this period and each year during this period; that in several years during the summer months after receipts from authorized hauls had reached a certain level, all additional receipts from the regular hauls were also deposited in the Ontario account on instructions from the Morrows; and that there were gross business receipts of Stevens deposited in the Ontario account in each of the years 1949 through 1956 that were never recorded in Stevens' regular books of account and were not included in the income reported on Stevens' tax returns for those years. Respondent admits that there were deductible expenditures made from this account which were neither reflected on the regular books nor claimed on the returns, and he has stipulated with the Morrows that certain of these amounts are deductible in each of the years involved. The Morrows also testified *85 that certain of the expenditures made from the Ontario account during each of the years involved were for the personal use of the Morrows and to pay for investments made by them. In fact, it is pretty clear even from the oral testimony that after the Ontario account was opened it was used by the Morrows to a substantial extent to pay for their personal living expenses. [13] This would indicate that there was an excess of receipts deposited in this account over deductible business expenditures paid from this account, which would be taxable income to Stevens in the first instance. While the evidence usable to prove fraud in the Stevens case is not as complete as it might have been had there been no separate stipulation of facts in the Morrow case, [14] we are convinced that respondent has proved by the required degree of evidence that Stevens deliberately failed to report all of its income in each of the years 1949 through 1956 with intent to *86 evade tax. This established a prima facie case that Stevens filed false and fraudulent returns with intent to evade tax for each of the years 1949 through 1956, which Stevens has failed to rebut. As a result the statute of limitations does not bar assessment and collection of the deficiencies in tax of Stevens for any of those years. The Deficiencies Having decided that the statute of limitations does not apply to any of the years in issue, we must decide to what extent there were deficiencies in those years. Respondent's determinations of deficiencies are presumed to be correct and Stevens has the burden of proving them erroneous. Respondent determined the deficiencies against Stevens by adding to Stevens' income as unreported sales for each taxable period prior to 1957 the amount of the deposits in Stevens' Ontario Bank account less *87 such expenditures therefrom as he could determine were deductible business expenditures. He also eliminated from the deposits checks drawn to Stevens reflecting receipts from regular invoices which were first deposited in the Ontario account and then transferred to the regular account and in this fashion were included in the income reported by Stevens. Respondent also increased Stevens' income by disallowing certain of the deductions claimed on Stevens' returns, such as expenditures made from Stevens' regular account, depreciation, etc., which respondent determined were personal expenditures of the Morrows and were nondeductible by Stevens. The evidence is clear that the moneys deposited in the Ontario Bank account were business receipts of Stevens and, except to the extent of the duplications which respondent has eliminated, constituted additional taxable income of Stevens in the form of unreported sales. We approve respondent's determinations in this respect. Stevens offered very little of its own evidence to prove error in respondent's determinations of additional income, possibly because such evidence was not available to it. However, respondent and the Morrows stipulated that *88 certain of the expenditures from the Ontario Bank account which had not been allowed as deductions by respondent were actually not personal expenditures of the Morrows, and respondent conceded that these amounts should be allowed as additional deductions to Stevens if it was determined that the deposits in the Ontario Bank account were income to Stevens, which we so determine. Respondent and the Morrows also stipulated that certain of the deductions claimed on Stevens' returns which respondent disallowed as personal expenditures of the Morrows were actually not personal expenditures for the Morrows, and respondent also conceded that these amounts should be allowed as deductions to Stevens. These stipulations still left some amounts in each category in dispute and we are required to determine which of these disputed items are personal to the Morrows and thus nondeductible to Stevens and which are deductible by Stevens. Although Stevens did not enter into the above stipulations and it might be argued that respondent is not bound thereby with respect to Stevens, we believe that under the circumstances justice suggests that we accept respondent's concessions above mentioned as concessions *89 with respect to Stevens, and indeed respondent does not argue to the contrary. Consequently, Stevens' additional income will be computed in accordance with the determinations in respondent's notice of deficiency to Stevens, adjusted to reflect the additional deductions allowable to Stevens as a result of respondent's concessions, any additional deductions allowable to Stevens as a result of our conclusions with respect to the disputed items which we will discuss below, and any other adjustments that may be required as a result of concessions made by both Stevens and respondent directly with respect to Stevens' income. The parties can take into account in their Rule 50 computations the conceded items and we will discuss below only the disputed items and indicate our conclusions with respect thereto. The disputed items are in two categories, (1) certain expenditures from the Ontario Bank account, and (2) certain expenditures claimed as deductions on Stevens' returns and disallowed by respondent. Except for the specific items we find to be deductible by Stevens as discussed below, the remainder of the disputed items or amounts must be held to be nondeductible by Stevens because Stevens *90 has failed to prove that respondent erred in not allowing them as deductions. The amounts in dispute with regard to the Ontario Bank account and a discussion of what the expenditures were for is related on pages 19 through 22 of our Findings of Fact. Our Findings of Fact with respect to the various categories of expenditures as there related are dispositive of this issue. We conclude that in addition to the expenditures from the Ontario Bank account allowed by respondent in his notice of deficiency to Stevens and those conceded by respondent at the trial, Stevens is entitled to deduct as business expense the following additional expenditures from the Ontario Bank account: 25 percent of the checks made payable to Stephen, Doris, cash, airlines, and hotels; 50 percent of the checks made payable to Don King, and Webster Liquors; 75 percent of the checks made payable to Rochester Club; 50 percent of the checks made payable to Florence Culligan; and the following amounts in the years indicated representing payments for goods damaged in transit, various employee and customer gifts and entertainment, and payments for drivers' required physical examinations: Year
Amount
1950
$ 34.60
1951
812.39
1952
549.81
1953
84.84
1954
$291.72
1955
166.01
1956
55.61
*91 The deductions claimed on Stevens' returns and disallowed by respondent fall into the nine categories set out on page 22 of our Findings of Fact. As indicated in our Findings of Fact, Stevens has either conceded that respondent was correct in disallowing the deductions, or failed to offer sufficient evidence to prove that respondent was in error in disallowing the deductions, for "rental expense," car insurance, personal property insurance, and maintenance expenses - Florida. With respect to the other categories listed, we conclude as follows: The payments to Aquinas Institute are deductible by Stevens; Yacht depreciation as claimed on Stevens' returns is deductible by Stevens; 25 percent of the travel and entertainment expense disallowed by respondent is deductible by Stevens; 50 percent of the amounts paid to Florence Culligan is deductible by Stevens; 50 percent of the amounts disallowed as payments for liquor is deductible by Stevens. With respect to the payments to Passero in 1959 of $6,000 we conclude, as best we can from the evidence available, that $1,500 of this amount was paid to Passero for services rendered in connection with the State Truck mileage tax examination *92 and is deductible by Stevens in 1959. Cf. Greene Motor Co., 5 T.C. 314. We conclude that the remaining $4,500 paid to Passero was paid for service in connection with attempts to sell the business. However, it would appear that these services were rendered in connection with the Morrows' personal efforts to sell the business or their stock in it and were in no way related to the business of Stevens. We therefore must sustain respondent's disallowance of $4,500 of the deduction claimed. See Royal Cotton Mill Co., 29 T.C. 761, 787-788. A deduction for legal expense claimed by Stevens for 1959 was disallowed by respondent with the explanation that "it represented a capital expenditure to Anthony Pitts in acquiring" Stevens' stock. Relying on our decision in Tobacco Products Export Corporation, 18 T.C. 1100, Stevens argues that the deduction is allowable in full as an expense of the partial liquidation involved in the redemption of Stephen's stock. There is no evidence of the nature of the services rendered in connection with the deduction in question. In view of the reason respondent gave for disallowing the deduction, the services seem to have *93 had something to do with the transaction whereby part of Stephen's stock was redeemed and part was sold. We have no idea what part of the services were related to what part of the transaction. Moreover, even if we were to assume that all of the services were related to the redemption, there would still be a failure of proof on Stevens' part, because not every expense of a partial liquidation is deductible as an ordinary and necessary business expense. Standard Linen Service, Inc., 33 T.C. 1, 16-17. We sustain respondent on this issue. The Additions to Tax Respondent has asserted 50-percent additions to tax for fraud for all of Stevens' taxable periods or years prior to 1957 under the provisions of section 293(b), I.R.C. 1939, and section 6653(b), I.R.C. 1954. The burden of proving fraud by clear and convincing evidence is borne by respondent. Sec. 1112, I.R.C. 1939; sec. 7454, I.R.C. 1954. Respondent has determined that Stevens realized unreported income as a result of deposits in the Ontario Bank for each taxable period *94 in question prior to 1957. Although we have determined that some additional Ontario Bank expenditures are deductible by Stevens, we have sustained respondent's determinations with respect to substantial amounts of such unreported taxable income for each period prior to 1957. It is abundantly clear that fraudulent intent was the cause of those understatements of income. Part of the deficiencies in Stevens' tax for each period prior to 1957 is due to fraud. The addition to tax shall be applied to the deficiencies computed under Rule 50. The Morrows Respondent has determined that the Morrows' actual income exceeded their reported income by substantial amounts for each of the years 1950 through 1959. Respondent's determinations were made on the basis of the annual increases in the Morrows' net worth plus their nondeductible personal expenditures. Use of the Net Worth Method The Morrows argue that respondent's net worth method should be rejected in favor of determining their actual income simply by adding the amounts of Stevens' funds spent for their personal benefit to their reported income. As we understand their argument, it is that respondent's method should be rejected because *95 he has not proved additional sources of income other than Stevens and because his net worth computation is pervaded with errors. As indicated previously, we do not accept this argument. An important point to emphasize is that the Morrows have stipulated, conceded, or otherwise not disputed the greatest portion of the amounts reflected in respondent's net worth computation. [15] Moreover, the annual amounts of additional income determined by respondent by using the net worth method exceed those which would result from the Morrows' proposed method and constitute evidence that their method is not reliable. Cf. Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871, certiorari denied 350 U.S. 845. Subject only to the restriction that the method chosen be reasonable, the choice of the method to be used in reconstructing the Morrows' income lay with respondent and not with the Morrows. Herbert Schellenbarg, 31 T.C. 1269, 1277, *96 affirmed in part and reversed in part 283 F. 2d 871. Having chosen to use the net worth method, respondent was required only to produce "evidence supporting the inference that the * * * net worth increases are attributable to currently taxable income." Holland v. United States, supra. In making the showing required by Holland v. United States, supra, respondent has the alternative of proving a likely source of additional taxable income or of negativing all sources of nontaxable income alleged by the taxpayer. United States v. Massei, 355 U.S. 595. The only nontaxable sources of income alleged by the Morrows were inheritances of $305.10 in 1950 and $6,069.51 in 1954. Respondent has conceded the 1950 inheritance. The questions concerning the alleged 1954 inheritance are discussed hereinafter. The important point at this stage is that, even if some adjustment to respondent's determination is required with respect to the alleged 1954 inheritance, there will still be substantial amounts of additional income reflected in respondent's net worth computation for each year in question for which no nontaxable source was alleged. In light *97 of that fact, we would be justified in approving respondent's use of the net worth method even if no other likely sources of additional income had been shown. Cf. United States v. Massei, supra; Albert N. Shahadi, 29 T.C. 1157, affd. 266 F. 2d 495, certiorari denied 361 U.S. 874. In any event, we are satisfied that Produce Transportation and the lock business were likely sources of additional taxable income to the Morrows. We will discuss on ensuing pages the errors which the Morrows allege were contained in respondent's net worth computation. On most of these disputed issues we have sustained respondent's position. In connection with those points where we have agreed with the Morrows, we have found no evidence that respondent acted in an arbitrary and unreasonable manner. Nor have we found any justification for inferring from the errors which were committed that any other portions of respondent's net worth computation were erroneous. Burden of Proof Respondent bears the burden of proving fraud for purposes of avoiding the statute of limitations with respect to years prior to 1957 [16] and justifying the additions to tax *98 which he has asserted for all the years in question. Sec. 1112, I. R.C. 1939; sec. 7454, I.R.C. 1954. The burden of proving the basic deficiencies erroneous, however, is borne by the Morrows. Lawrence Sunbrock, 48 T.C. 55, 63. The burden borne by the Morrows relates to each specific element of respondent's net worth computation and the presumption of correctness continues to attach to those items which have not been shown to be erroneous. Banks v. Commissioner, 322 F. 2d 530, 548, affirming on all issues here relevant a Memorandum Opinion of this Court; Hoffman v. Commissioner, 298 F. 2d 784, 788, affirming on all issues here relevant a Memorandum Opinion of this Court; Commissioner v. Smith, 285 F. 2d 91, 95, affirming a Memorandum Opinion of this Court; Anderson v. Commissioner, 250 F. 2d 242, 246, affirming on all issues here relevant a Memorandum Opinion of this Court, certiorari denied 356 U.S. 950; cf. Charles Oran Mensik, 37 T.C. 703, 724-725, affd. 328 F. 2d 147, certiorari denied 379 U.S. 827. *99 In order to present the items in dispute between respondent and the Morrows more clearly, we will first discuss them in terms of respondent's determinations of deficiencies. During this discussion, we will accord respondent's determinations the normal presumption of correctness and will resolve questions on which there is insufficient evidence against the Morrows because of their failure to satisfy their burden of proof. We recognize, however, "that respondent cannot meet his own burden of establishing fraud on the basis of petitioner's failure to discharge the burden of proving error in the determination of deficiencies." Luerana Pigman, 31 T.C. 356, 370. In determining whether or not respondent has satisfied his burden we shall examine the extent to which he has provided affirmative proof of the understatements in the Morrows' reported income on which he relies as evidence of fraud. Disputed Items in Respondent's Net Worth Computation Although the Morrows have stipulated a great portion of the items reflected in respondent's net worth computation, they do claim to have discovered and proved a number of specific errors in that computation. Some items were *100 neither stipulated nor disputed and we consider them to have been conceded by the Morrows. The items which the Morrows have expressly disputed are discussed below in the order of assets, liabilities nondeductible expenditures, and nontaxable receipts. Cash on Hand Respondent gave no credit to the Morrows for cash on hand. The Morrows do not claim that they ever did have any cash on hand but contend that respondent should have given them credit for an estimated amount. The pattern of borrowing by Stephen and Stevens, as well as Stephen's financial statements, indicate that he did not make a practice of keeping cash on hand. In any event, in view of the Morrows' failure to claim any particular amount, we do not consider that a substantial issue has been raised on this point. Cash in Banks Although the Morrows have stipulated all of the amounts shown for cash in banks, they have made one argument which seems logically to come under this heading. The findings show that respondent conceded that various Ontario Bank expenditures were improperly reflected as personal living expenses of the Morrows. Part of the amount conceded by respondent for the year 1953 included $5,100, which *101 respondent conceded was a duplication. The Morrows claim that this $5,100 represented money obtained with cash checks drawn on corporate bank accounts which was deposited in personal bank accounts. As we understand the Morrows' argument, the duplication arose because the cash was reflected once as personal expense when the checks were drawn on the corporate bank accounts and then duplicated by being included in the year-end balances in the personal bank accounts. The Morrows make these points in the process of trying to show respondent's net worth computation to be pervaded with error. Although they concede having been unable to check whether the duplication described above took place in any year besides 1953, they argue that the same sort of error probably was made in other years. We agree with the Morrows that the sort of error described above was a methodological error which probably would have been made for other years in similar circumstances. The minimum evidence required for us to assume that such errors were made for other years, however, would be that cash checks on the corporate accounts were used to make deposits in the personal accounts during those years. As there *102 is no evidence on that point, the Morrows must be content with respondent's concession for 1953. Contributions to Stevens' Capital The Morrows contend that the opening net worth statement on December 31, 1949, is erroneous because it fails to take account of an additional asset in the form of contributions to Stevens' capital of $14,818.52, which Stephen had made prior to that date. We have found that Stephen did make such contributions to capital of at least the claimed amount. The amount shown on respondent's net worth statement with respect to Stephen's investment in Stevens' stock should be increased by the claimed amount for each net worth date through December 31, 1958. Stephen's basis in that stock is to be increased by that amount for purposes of computing the gain on the sale and redemption in 1959. Kasle v. United States, 75 F. Supp. 340 (N.D. Ohio); see also sec. 1.118-1, Income Tax Regs. Our determination on this issue will have the double consequence of reducing the increase in the Morrows' net worth which respondent has determined for 1959 and reducing the amount to be excluded from gross income for 1959 with respect to the *103 nontaxable portion of the capital gains. Other Stock Investments The only amounts for other stock investments which are disputed by the Morrows are those shown for December 31, 1956, and December 31, 1958. Respondent included in both of those amounts the cost of stock which was shown on the broker's statement to have been purchased on December 31 of the respective year. The Morrows contend that the checks issued to pay for the stock, either in full or to the extent of the applicable margin requirement, could not have cleared the bank by December 31, 1956, or December 31, 1958. Moreover, they contend, since respondent did not show that the year-end bank balances were adjusted for these purchases, the cost of the stock may be duplicated. Although Nunn testified that the date shown on the broker's statement is normally several days later than the actual date of purchase, it is not necessary to determine whether that was the case here. We do not know whether checks were issued to pay for this stock or not. The Morrows have not shown us any checks or attempted to prove in any other way that such checks as were issued did not, in fact, clear the bank by year-end. Sheer speculation cannot *104 suffice where proof is required. The amounts determined by respondent must stand. Notes Receivable from Stevens Although the Morrows stipulated the amounts shown for notes receivable from Stevens, they argue on brief that these amounts were erroneously treated. As we understand their argument, they contend that the notes represent declared bonuses from Stevens which were not paid until the following year and that reflecting the notes in the year the bonuses were declared distorts the Morrows' income for that year "even though the adjustment would be corrected in the final year." We must reject the Morrows' charge of error on this point, for there is no evidence that the notes were related in any way to bonuses. Improvements to North Avenue Property As described in our findings, although Stephen owned the North Avenue property during all the years in issue, the parties thought that Stevens owned the property. Stevens periodically made improvements to the property. Respondent reflected the cost of these improvements in the net worth computation by increasing the amounts shown for the Morrows' investment in the property as of the end of 1950, 1951, and 1952. The Morrows contend *105 that respondent's treatment of the improvements was erroneous. The Morrows argue that a lessor does not realize income with respect to improvements made by a lessee. The most obvious difficulty with this argument is that there was never any lease. Even if we ignore the parties' belief that Stevens owned the property, Stevens' occupancy would constitute no more than a tenancy at will which would not be within the rationale of M. E. Blatt Co. v. United States, 305 U.S. 267. The facts of this case are substantially the same as those in Jaeger Motor Car Company v. Commissioner, 284 F. 2d 127, affirming a Memorandum Opinion of this Court, certiorari denied, 365 U.S. 860. We approve respondent's treatment of this item on the authority of that case. We find no merit in the Morrows' other arguments on this issue. Debit Balance in Brokerage Account The only liability item which the Morrows question is the debit balance in brokerage accounts shown for December 31, 1955. Although the records maintained by Stephen's stockbroker showed a liability as of December 31, 1955, of $10,850.60, respondent made an adjustment decreasing that liability by $10,375.71. *106 Respondent contends that his adjustment is justified because the Morrows sold stock in December 1955, and the proceeds of $10,375.71 were not credited to the Morrows' liability until after December 31, 1955. The cost of the stock in question was not shown as an asset on December 31, 1955. The Morrows argue that the liability item in question was "adjusted arbitrarily" by respondent, but have not provided any evidence or reasoning whatever in support of this assertion. It would appear from the only evidence available that either the cost of the stock sold should be added to the Morrows' assets as of the end of 1955, or that this liability should be reduced. Inasmuch as the Morrows reported the sale of stock of three companies on the last few days of December on their 1955 return, we will not disturb respondent's treatment of this item. Estimated Deductions - Estimated Living Expense Since the Morrows have made the same argument concerning "estimated deductions - p. 3 of return," shown for each of the years 1950 through 1954, and "estimated living expense," shown for each of the years in question, we will discuss these two items together. The Morrows' argument with respect to *107 these two items is based on the fact that neither they nor Stevens ever had any income in the form of currency. Pointing out that checks payable to cash were treated as personal expenditures when they were drawn on the various bank accounts involved, the Morrows argue that the cash used to make the usual payments for miscellaneous goods and services was obtained from those checks which had already been adequately reflected in the net worth computation. Respondent dismisses the Morrows' argument summarily on the grounds that they are contending that all payments were made by check. The amounts included by respondent as "estimated expenditures-p. 3 of return" appear to be the amount of the standard deductions claimed by petitioners on their returns for 1949 through 1954. We do not believe additions to petitioners' income on this basis, in addition to all of the other adjustments respondent has made to petitioners' income for personal expenditures, are justified. We find for petitioners on this item. We also believe petitioners have otherwise been charged with a sufficient amount of cash expenditures to eliminate the justification for charging them with an additional $500 of "estimated *108 living expenses" in each year. We also hold for petitioners with respect to this item. Payments for Automobiles The Morrows contend that respondent erred in adding to their income, under the heading "payments for automobiles," amounts paid by Stevens for automobiles that were used in Stevens' business. Petitioners do not question the automobiles purchased with their own funds. Respondent argues that the automobiles in question that were purchased with Stevens' funds were titled in the name of the Morrows and represent constructive dividends to the Morrows from Stevens. The Morrows counter with the claim that they were titled in their names only to save on the cost of insuring the automobiles. The only expenditures in contention, as we understand it, are the $5,950 expenditure in 1954, the $2,300 expenditure in 1955, the $6,404.61 expenditure in 1958, and the $5,916 expenditure in 1959. Leaving the 1954 expenditure to last, we find that $2,000 of the $2,300 expenditure in 1955 was part payment on a Rolls Royce, and the remaining $300 was paid to Ward Maurer for some undisclosed reason. The evidence is not sufficient to convince us that either of these payments was for automobiles *109 used in Stevens' business and we must sustain respondent on these items. Nor is there any evidence that the $6,404.61 expenditure in 1958 was from Stevens' funds. We likewise must sustain respondent on this item. The expenditure of $5,916 in 1959 was made by Stevens for a 1959 Cadillac that was distributed to Stephen in connection with the redemption of his stock. Of course the fair market value of the Cadillac on the date of distribution should be added to the Morrows' assets rather than adding the cost of the Cadillac to their income for 1959 as a personal expenditure. We have no basis for determining whether the fair market value of the Cadillac on the date of distribution was any different than the cost of the car, and inasmuch as respondent's treatment of this item would make no difference in the computation of the Morrows' income for the year 1959, the last year before us, we will sustain respondent with respect to this item. The expenditure of $5,950 in 1954 was the purchase price of an automobile made $100 in cash and $5,850 by a check drawn on Stevens' Ontario account. While it appears to be true that this automobile was titled in Stephen's name, we accept Stephen's explanation *110 of this as reasonable and find that Stevens was the real owner of this automobile. There is considerable evidence that this automobile was used almost exclusively in Stevens' business, and that several other automobiles purchased with the Morrows' funds were also used in Stevens' business without reimbursement to the Morrows for this use. So far as we can tell from the evidence neither the Morrows nor Stevens claimed any depreciation on any of these automobiles used in Stevens' business. Under all the circumstances and the evidence we believe respondent erred in charging the cost of this automobile to the Morrows as a personal expenditure in 1954. [17]
Personal Living Expense -Ontario Account The amounts which respondent has determined were personal expenditures of the Morrows out of Stevens' Ontario Bank account have been disposed of largely by stipulated concessions by respondent and the Morrows. With the exception of the wages paid Florence Culligan, the only issue concerning the Ontario *111 Bank expenditures still in dispute is whether they were personal to the Morrows or were made in connection with Stevens' business. We have made findings which specify the nonpersonal and personal portions of the disputed amounts. Those findings are based on our assessment of all of the testimony and other evidence and detailed discussion would extend this opinion unduly. The parties will reflect the amounts indicated by those findings in their computations under Rule 50. Any amounts determined by respondent in the notice of deficiency to be personal expenditures of the Morrows which have neither been conceded by respondent nor been found by the Court to be nonpersonal expenses, will be considered as personal expenses of the Morrows. With regard to the wages paid Florence Culligan, we agree with the Morrows that that portion of the wages paid to her by Stevens for running errands and performing other incidental services for Stevens, which we have found to be 50 percent of the wages paid her, are not taxable to the Morrows. We do not agree with the Morrows that the remaining 50 percent of the wages paid her for housework around the Morrows' living quarters is excludable from their *112 income under section 119, I.R.C. 1954. [18]Section 119, I.R.C. 1954, and section 29.22(a)-3, Regs. 111, applicable to the years prior to 1954, provide basically that the value of meals and lodgings furnished an employee by his employer for the convenience of the employer shall be excluded from the gross income of the employee. Here we have found that the Morrows owned the building in which they lived, so Stevens was not furnishing lodgings for them, and the above section of the 1954 Code and of the regulation are not applicable. This being so, the value of incidental services furnished by the employer in connection with that lodging is not excludable from the employee's income. The 50 percent of the wages paid Florence Culligan by Stevens for housework around the Morrows' lodgings was for the personal benefit of the Morrows and is includable in their income. *113 Personal Living Expenses - Disallowed in Corporation The remaining expenditures with respect to which the parties are in dispute are certain expenditures paid out of Stevens' regular account and claimed as deductions by Stevens on its returns. Respondent disallowed these items as deductions to Stevens and added a part thereof to the income of the Morrows as an item designated "Personal living expenses - disallowed in corporation." We can determine from the record what most of the items placed in this category consisted of and the amounts thereof, but there are one or two items about which we have some doubts. We are satisfied that it included payments to Aquinas Institute, travel and entertainment expense, liquor expense, payments to Florence Culligan, and a payment of $6,000 to Passero in 1959, all of which we have discussed heretofore. We conclude that those portions of the above payments which we have found were not deductible by Stevens were expenditures by Stevens for the personal benefit of the Morrows and are includable in the Morrows' income. This includes none of the payments to Aquinas Institute, 75 percent of the payments for travel and entertainment, 50 percent of *114 the liquor expense, 50 percent of the payments to Florence Culligan, $4,500 of the payment to Passero, and the expenditures for car insurance. The Morrows have also conceded that expenditures for personal property insurance and maintenance expenses - Florida were personal expenditures includable in their income. This leaves one item in this category of additional income charged to the Morrows about which we have some uncertainties. This item is listed on a schedule attached to respondent's net worth statement as "disallowed rental expenses." No deduction so entitled was claimed on Stevens' returns, and the record leaves it unclear just what this item contains. As best we can determine it seems to include the cost of utilities paid by Stevens in connection with the Morrows' lodgings. [19] The Morrows' only argument with regard to this item is that it is excludable from their income under section 119, I.R.C. 1954. For the reasons discussed above, we cannot agree. Consequently, this item must be included in the Morrow's income for failure of petitioners to carry their burden of proving respondent's determination to be in error. *115 Nontaxable Receipts The Morrows claim that Stephen inherited $305.10 from Louis J. Phillips in 1950 and $6,069.51 [20] from his father, Thomas Morrow, in 1954, and that adjustments reflecting those inheritances should be made to respondent's net worth computation. Responent has conceded that an adjustment should be made with respect to the 1950 inheritance but contends that the Morrows have not proven that any adjustments should be made for the alleged 1954 inheritance. Stephen testified that he had received the above amount upon distribution of his father's estate, and he offered in evidence a certified copy of a New York estate tax return filed in connection with his father's estate. This return listed total assets of $15,215.76, total liabilities of $4,703.25, including $2,565.48 payable to Stephen Morrow for moneys advanced, and distributions to three beneficiaries totaling $10,512.11, including $3,504.03 to Stephen Morrow. While this is probably not the best evidence available, we have accepted it as establishing prima facie a source *116 of nontaxable income and the amount thereof. Respondent made no attempt by any means to negative that nontaxable receipt. We conclu e that a credit for the claimed amount of non-taxable income is proper for 1954. Cf. Albert N. Shahadi, supra.
Additions to Tax for Fraud Respondent has sustained his burden of proving by clear and convincing evidence that at least a part of the Morrows' underpayments in tax for each of the years 1950 through 1959 was due to fraud and the 50-percent additions to tax for fraud are sustained. The evidence as a whole paints a clear picture of a deliberate scheme on the part of the Morrows, starting in 1949, to divert a large part of the receipts of Stevens into the Ontario Bank account without including it in the reported income of the corporation and then drawing on that account at will in each of the years 1949 through 1958 for payment of the Morrows' personal living expenses and investments, without reporting any of these withdrawals as income to themselves. They also frequently drew checks on the regular corporate account for payment of their personal living expenses without reporting any such amounts as income to themselves. In *117 addition Stephen carried on two separate businesses from which gross income was realized, kept a separate set of records and a separate bank account for one of them, but failed to report any income from either of these businesses on his tax returns. The entire course of conduct of the Morrows with respect to their income is convincing that they were aware that this income should be reported and that the separate records and bank accounts were maintained in order to conceal this unreported income in order to evade payment of tax thereon. Respondent's net worth computations, and indeed the Morrows' own admissions, reflect repeated and large understatements of income year after year. Repeated understatements of income in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income provide an adequate basis for inferring that the resulting deficiencies were due to fraud. Anderson v. Commissioner, supra.See also Lawrence Sunbrock, supra, and cases cited therein. The Morrows were successful in business and had substantial investments in Stevens and other corporations. It is clear that they understood that distributions *118 by corporations are ordinarily taxable - but they failed to report in their income any of the withdrawals of corporate funds they made for their personal use. They employed an accountant to prepare their tax returns but failed to divulge to him all of their income. In fact they refused to follow his suggestion that they keep only one set of books for Stevens because this would have required that all income from the business be reported and all withdrawals be recorded. Petitioners argue that it is improper to assess additions to tax for fraud against both the corporation and the individuals based on the same transactions. The answer to this is that the corporate fraud is based on its failure to report all of its income, while the individuals' fraud is based on their withdrawal of corporate funds for their personal use without including it in their income. In appropriate circumstances, such as those existing here, additions to tax for fraud may clearly be assessed against both the corporation and the shareholders. Cf. Irving S. Federbush, 34 T.C. 740, affirmed per curiam 325 F. 2d 1. Petitioners also argue that the withdrawal of corporate funds in excess *119 of the earnings and profits of the corporation would not be taxable to them and hence the failure to report such withdrawals would not be fraudulent. As previously noted, because of the manner in which the Morrows kept Stevens' books and records, we are unable to determine whether any of their withdrawals were in excess of Stevens' earnings and profits; but it is also clear that the Morrows were not at all concerned about this when they made the withdrawals. The Morrows also contend that respondent has failed to prove fraud against them for the years 1957, 1958, and 1959 because no deposits were made in the Ontario Bank account after 1956. However, rather sizable sums of money were withdrawn from this account by the Morrows for their personal use in 1957 and 1958 and they failed to include any of these withdrawals in their income. Corporate funds withdrawn for their personal use would be taxable to them when withdrawn. And in addition to the large amount of unreported income for the year 1959 reflected in respondent's net worth statement, and the Morrows' withdrawal of funds from Stevens' regular account for their personal use in 1959, the Morrows pleaded guilty to a charge of criminal *120 tax evasion for the year 1959. This alone would sustain the additions to tax for fraud for the year 1959. Arctic Ice Cream Co., supra.
The Morrows' final argument concerning the additions for fraud is that they should not be applied to deficiencies resulting from respondent's treating certain deductions disallowed to Stevens as personal expenditures. This argument, too, is without merit. Arlette Coat Co., supra.
Statute of Limitations On the basis of all the evidence and considerations previously discussed herein we have found that the Morrows filed a "false or fraudulent return with the intent to evade tax" for each of the years 1950 through 1959. Assessment of tax and additions for all years in issue may be made at any time. Sec. 276(a), I.R.C. 1939; sec. 6501(c), I.R.C. 1954. Claimed Overpayment for 1959 The Morrows argue that they overpaid their tax for 1959. This argument is based solely on their recomputation of the tax actually payable on the gain realized by Stephen as a result of the redemption of half of his Stevens' stock. Although we agree that the gain on that redemption was improperly computed, the overstatement *121 on that one transaction was more than offset by the understatements for 1959 revealed by respondent's net worth computation, with any adjustments made herein. Additions for Failure to Pay Estimated Taxes Respondent determined that additions to tax under section 294(d)(1)(A), I.R.C. 1939, were payable by the Morrows for each year 1950 through 1954. The only argument the Morrows make regarding those additions is that the existence and extent of liability should be determined on the basis of the recomputations under Rule 50. We agree that such procedure is appropriate. Decision will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Doris M. Morrow, docket No. 4589-64; Stephen L. Morrow, docket No. 4590-64; and Stevens Truck Lines, Inc., docket No. 4600-64.↩
2. The individuals, Stephen and Doris Morrow, filed separate returns for the years 1950 and 1951, and, although the deficiencies and additions for those years in docket No. 4590-64 and docket No. 4589-64 are slightly different, the amounts reflect the individuals' joint increases in net worth and personal expenditures and are, for that reason, duplicative. Respondent agrees that the total deficiencies and additions for 1950 and 1951 cannot be collected from each individual taxpayer, and petitioners' counsel proposed that either the returns be treated as joint returns or the additional income be split evenly between the individuals. We have hereinafter found the amounts of additional income for 1950 and 1951 for the individual taxpayers jointly. ↩
2a. The statutory notice indicates an overassessment of $79.64 under sec. 294(d)(2), I.R.C. 1939↩, with respect to the individuals for 1954. 3. Respondent conceded on brief that fraud was improvidently asserted with respect to Stevens for the years 1957, 1958, and 1959.↩
4. The term "valid" is used only to signify that the consent forms were properly executed. The Morrows contend that the agreements with respect to 1958 and 1959 were not timely and hence ineffective.↩
5. Other deductions claimed by Stevens which were disallowed with no corresponding effect on the Morrows' income are treated under the separate findings of fact with respect to Stevens. ↩
6. This item has been conceded by Stevens and the Morrows to have been properly treated by respondent.↩
7. Passero testified that the transfer was in May or June of 1959, but a balance sheet prepared in connection with the sale to Pitts listed the Imperial among Stevens' assets as of June 30, 1959. It is clear, however, that the Imperial was transferred to Passero by Stevens and did not reach Passero via a transfer by Stevens to Stephen in connection with the stock redemption in September 1959.↩
8. The "parties," when used in connection with stipulations herein, means the Morrows and respondent.↩
*. The amount reflected in the statutory notice and the table of assets above was $6,481.71. ↩
**. The amount reflected in the statutory notice and the table of assets above was $761.02. ↩
***. Neither the statutory notice nor the table of assets above reflects any portion of this amount.↩
1. See prior table for computations. ↩
2. For 1950 and 1951 the amounts shown for estimated deductions and Federal income tax are totals for both Stephen and Doris. Other amounts were identical in the separate net worth statements. ↩
3. No explanation is given why respondent has included expenditures for assets, such as automobiles, boats, and airplanes, in nondeductible personal expenditures rather than in the net worth statement. For the year in which the expenditure was made it would make no difference in the computation of petitioners' income but we believe it would make a difference in the year the asset is disposed of. However, petitioners have not questioned this treatment of these expenditures, and we do not have sufficient information to change the treatment ourselves.↩
9. From the evidence presented it is somewhat difficult to determine just how respondent arrived at the adjustment to capital gains made in the notice of deficiency, although the amount of respondent's adjustment and the above figures are not far apart. On their return the Morrows reported a capital gain of only $4,923.98, and also reported the sum of $14,462.42 as dividends received on the transaction. The Morrows' treatment of the transaction was admittedly erroneous.↩
10. Various adjustments were made to gross deposits in arriving at net deposits. These adjustments reflected accrued accounts receivable, loans and redeposits, and exchange checks deposited in the Genesee Bank.↩
11. On brief respondent relies on section 6501(c)(2), I.R.C. 1954↩, as well as the sections cited above. We note simply that the express terms of that section exclude taxes imposed by subtitle A, which are the only taxes involved in this proceeding.
12. Although respondent did argue at one point that certain deductions related to the North Avenue property were fraudulently claimed, he has since conceded that no fraud penalty is appropriate for the years after 1956, when the same deductions were being claimed and there were no deposits to the Ontario Bank account. Consequently, we construe respondent's concession to incorporate the question of imputing fraud to Stevens because of those deductions. In any event, there is ample evidence that the deductions were claimed innocently, if not necessarily correctly.↩
13. It is interesting to note that almost as soon as the deposits in the Ontario account were stopped in June of 1956, the Morrows began drawing considerably larger salaries from Stevens which reduced Stevens' taxable income to a minimum.↩
14. On at least one occasion counsel for Stevens asked the revenue agent on the witness stand if he had a schedule showing the amounts of expenditures from the Ontario account charged to the Morrows as living expenses in each year. Upon ascertaining that the information was contained in a stipulated exhibit the matter was pursued no further.↩
15. The term "net worth computation" is used herein to indicate all of the aspects of respondent's determinations of the Morrows' additional income, including assets, liabilities, nondeductible personal expenditures, and nontaxable items.↩
16. And possibly for 1958 and 1959 if the provisions of section 6501(e)↩ of the 1954 Code do not apply to lift the bar of the statute of limitations.
17. While this might lead to the conclusion that Stevens should be allowed a deduction for depreciation on this automobile, we have no evidence on which we could compute such a deduction.↩
18. Section 119, I.R.C. 1954, is applicable only to the years subsequent to 1953. Sec. 7851, I.R.C. 1954↩. The Morrows do not argue that the housework was required in connection with the feeding and entertaining of Stevens' customers and employees.
19. While there is some evidence that the item disallowed to Stevens included real estate taxes, depreciation, and other expenses related to the Morrows' building, the item added to the Morrows' income does not appear to include either taxes or depreciation.↩
20. This amount is the total of advances and beneficiary's share shown to be payable to Stephen on the return for his father's estate.↩